IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| TANYA SOULE, as Holder of Power of Attorney for MARLENE DO, Her Mother, a Currently Disabled Adult, and LONG DO, Her Husband,<br>    Plaintiffs,<br><br>v.<br><br>BLESSING HOSPITAL, a corporation; SCOTT HOUGH, M.D.; ISIDOROS VARDAROS, M.D.; BRYAN MOORE, M.D.; SHAILA O'DEAR, R.N.; JASON LITTLE, APRN; KRISTIN HAMPTON, R.N.; REBECCA DENNISON, R.N.; AUSTIN HAKE, M.D., ANGELO LLANA, M.D.; and QUINCY PHYSICIANS & SURGEONS CLINIC, S.C. d/b/a QUINCY MEDICAL GROUP,<br>    Defendants. | Case No. 20-cv-1398 |

OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendants' Motion to Bar the Testimony of Plaintiffs' Economic Expert Stan Smith, Ph.D. (Doc. 206). For the reasons that follow, Defendants' Motion is Granted in part and Denied in part.

I.    BACKGROUND

This is a medical negligence case filed by Plaintiffs Tanya Soule, as holder of Power of Attorney for Marlene Do ("Marlene"), her mother, a currently disabled adult, and Long Do, Marlene's husband. Plaintiffs allege Defendants were negligent in failing to timely diagnose and manage Marlene's ischemic stroke on December 11, 2019. Defendants deny

they were negligent and deny proximately causing any injury to Marlene. Defendants Blessing Hospital; Scott Hough, M.D.; Shaila O'Dear, R.N.; Jason Little, APRN; Kristin Hampton, R.N.; Angelo Llana, M.D.; and Rebecca Dennison, R.N. move under Federal Rule of Evidence 702 to exclude all but the present value of future life care opinion testimony of Plaintiffs' expert witness on economics, Stan Smith, PhD. (*Id.*).

Plaintiffs state Dr. Smith's report calculates the value of certain losses due to Marlene's injuries, as follows: (1) the loss of household/family services, including the loss of housekeeping and household management services; and the loss of the advice, counsel, guidance, instruction and training services sustained by Marlene's family; (2) the present value of future life care; (3) the reduction in value of life, also known as loss of enjoyment of life or hedonic damages; and (4) the loss of society or relationship sustained by Marlene's family. (Doc. 216).

Plaintiffs state Dr. Smith is the President of Smith Economics Group, Ltd., headquartered in Chicago, Illinois, which provides economic and financial consulting nationwide. (*Id.* at 2). Dr. Smith has worked as an economic and financial consultant since 1974. (*Id.*) He has performed economic analysis in a variety of cases, including personal injury and wrongful death actions. (*Id.*) Dr. Smith has over 40 years of experience in the field of economics and wrote the first textbook on Forensic Economic Damages. (*Id.*)

Plaintiffs claim Dr. Smith's expert testimony is based on his background, training, experience, and materials he has reviewed, including deposition transcripts and records. Moreover, the testimony will assist the trier of fact to determine the economic loss to the family, because economics and the calculations of future damages are not within the

common knowledge of lay individuals. Therefore, Plaintiffs contend Dr. Smith's opinions should not be barred.

## II. DISCUSSION

Defendants seek to bar Dr. Smith from providing testimony at trial regarding purported loss of household/family services sustained by Long Do, hedonic damages sustained by Marlene, and loss of society or relationship sustained by Long. Defendants contend all of these opinions are based on methodologies that are unreliable and are not supported by facts specific to Marlene. Defendants argue Dr. Smith inappropriately relies upon a mixture of nationwide survey data and professional earnings data, including a 50% non-wage component associated with professional agency overhead, to calculate what he characterizes as replacement costs for those household/family services performed by Marlene prior to her alleged injury. However, no evidence or foundation exists that establishes a nexus between the nationwide survey data or the professional earnings data and the household/family services Marlene actually performed prior to her alleged injury. Defendants allege the same is true for his reduction in value of life opinions and loss of society or relationship sustained by Long Do.

### A. Legal Standards

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court interpreted an earlier version of Rule 702 and explained that it imposes a special gatekeeping obligation on trial judges with regard to scientific testimony. The district court's "gatekeeping obligation . . . applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony."). While the scientific or technical evidence need not have general acceptance, the district court must ensure that the evidence is relevant and reliable before admitting it. *See Daubert*, 509 U.S. at 588–89; *see also United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (noting that judges act as gatekeepers "to ensure that expert testimony is both relevant and reliable").

In acting as a gatekeeper, district courts must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Courts consider the reliability of an expert's opinion by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023) (quoting *Daubert*, 509 U.S. at 592–93). Some factors to consider

include: "(1) whether the particular scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Id.* at 509 (internal quotation marks and citations omitted).

Rule 702 requires a flexible inquiry and recognizes that the accuracy of proposed expert testimony can be explored adequately via the normal adversarial process of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lees*, 714 F.3d at 526 (quoting *Daubert*, 509 U.S. at 596). It is "the soundness and care with which the expert arrived at her opinion" that is the focus of the inquiry and not "the ultimate correctness of the expert's conclusions." *Anderson*, 61 F.4th at 510.

### B. Loss of Household/Family Services

Dr. Smith's opinions regarding the loss of household/family services include two subcategories alleged to be sustained by Long Do: (a) loss of housekeeping and household management services; and (b) loss of advice, counsel, guidance, institution, and training services. Defendants contend these damages are speculative and will not assist the jury. Plaintiffs allege Illinois law recognizes loss of household services as a recoverable pecuniary loss and Dr. Smith's methodology meets all legal standards for admissibility.

As for loss of housekeeping and household management services, Dr. Smith opined that Long suffered a loss in the amount of $378,775. Defendants note Dr. Smith arrived at that figure by first identifying the number of hours of housekeeping and household management services Marlene would have provided Long but for her injury. He determined that would be 10 hours a week based solely on an interview with Tanya Soule, Marlene's daughter. Dr. Smith explained how he chose 10 hours per week:

> Based on the daughter indicating that her mother provided perhaps less than what one might expect on average, and I suggested to a trier of fact that if they believe it's 10 hours, then they have my answer. If they believe it's nine hours, they make take 10 percent off this number. If they believe it's 11 hours, they may add 10 percent to this number. I used 10 percent as a tool, an aid and a guide as the report states that these estimates are intended to serve.

(Doc. 206-2 at 42–43). According to his report, Dr. Smith then multiplied 10 hours by the mean hourly professional earnings of numerous industries and trades, which was $18.49 per hour in year 2022 dollars using information from the May 2022 National Occupational Employment and Wage Statistics by the U.S. Bureau of Labor Statistics, Occupational Employment Statistics. (Doc. 206-1 at 4). Thus, Dr. Smith multiplied the amount of time it would take a non-professional to complete a particular task by the costs it would take to hire a professional to complete that task.

Dr. Smith then included a 50% non-wage component to the hourly wage rate. The non-wage component consists of "advertising, hiring and vetting, training, insuring and bonding the part-time service provider, and who are also responsible for pay-related costs such as social security contributions, etc." (*Id.*) Dr. Smith believes that the non-wage component is necessary to include because it is "consistent with labor market theory and

competitive market behavior." (*Id.* at 5). Dr. Smith acknowledged Marlene was not a professional of any trade upon which he relied. He did not ask Marlene or Long whether they paid for any of the services which he relied on in his calculations. Dr. Smith admitted the calculation is his "estimate of the market value of the services performed by a female in the household on average." (Doc. 206-2 at 54).

Dr. Smith created three tables to show his calculations for past and future loss of household/family housekeeping and household management services. In calculating these items, Dr. Smith took 10 hours of housekeeping and household management services and multiplied those hours by $18.49 per hour for the mean household management services based on several industries/trades multiplied by the 50% non-wage component. For future loss, he performed the same equation but accounted for a discount rate. (*Id.* at 54–55).

Dr. Smith created a similar calculation to opine on the monetary loss of household/family advice, counsel, guidance, instruction, and training services for Long. He shows "the pecuniary loss of advice, counsel, guidance, instruction, and training services sustained by Mrs. Do's husband using the estimated market-based valuation cost method." (Doc. 206-1 at 6). He created an hourly rate by taking "the mean hourly earnings of educational, guidance, and career counselors and advisors; marriage and family therapists; child, family and school social workers; social and human service assistants; clergy, directors, religious activities and education; coaches and scouts; elementary school teachers, except special education; and personal financial advisors" based on the U.S. Bureau of Labor Statistics, Occupational Employment Statistics, May 2022 National

Occupational Employment and Wage Statistics. *Id.* The mean hourly wage is $32.57 and Dr. Smith adds on a 50% non-wage component.

Dr. Smith assumed for purposes of his opinions a loss of one hour per day for lost advice, counsel, guidance, instruction, and training services based on his interview with Marlene's daughter. Defendants note Dr. Smith did not interview Long to ask him how many hours a day of "counsel" or "advice" he thinks he lost due to Marlene's injuries. Dr. Smith valued the loss at 75%. He multiplied that one hour by his professional earnings estimate, $32.57, then multiplied by 50% non-wage component, then multiplied by a loss of 75% for a total loss of advice, counsel, guidance, instruction, and training as a result of the alleged injuries to Marlene in the amount of $147,162. Dr. Smith performed the same equation for future loss but also accounted for a discount factor to create the present cash value.

Plaintiffs note loss of household services is a compensable form of injury. *See, e.g., Passafiume v. Jurak*, 2024 IL 129761, 248 N.E.3d 1042. Plaintiffs allege Dr. Smith's testimony involves the loss of household services sustained by the family from the time of Defendants' alleged negligence through Marlene's life expectancy. Dr. Smith valued the economic loss for these services performed by Marlene by using the "market-based replacement cost method," which Plaintiffs claim is a well-known method to calculate such damages.

Dr. Smith's expert testimony regarding household services was recently determined to be admissible by the Appellate Court of Illinois. In *Passafiume v. Jurak*, 2023 IL App (3d) 220232, 218 N.E.3d 1253 (2023), the defendant argued testimony as to

household services and family guidance/accompaniment was speculative in that it spoke more to general labor trends than to the specific tasks provided by the plaintiff's late wife. *Id.* at 1256. The defendant also argued the elements were not appropriate for expert testimony addressing the commercial value of such testimony. *Id.* Moreover, the testimony was no more than marginally relevant and potentially misleading. *Id.* The trial court permitted Dr. Smith to testify to opinions and calculations regarding the loss of household services because such losses were easily quantifiable, while barring him from testifying about the loss of family guidance/accompaniment because those aspects of personal relationships are not easily quantifiable. *Id.* at 1257. The appellate court affirmed the trial court's ruling admitting Dr. Smith's testimony, noting that his "opinions were in part based on objective information and statistics" and the "testimony was subjected to vigorous cross-examination and the jury was free to accept or reject such testimony." *Id.* at 1273; *see also Little v. City of Chicago*, 2025 IL App (1st) 231131-U; 2025 WL 962161, at *8 (1st Dist. 2025) ("The jury remained free to disbelieve and disregard Dr. Smith's testimony, particularly given defense counsel thorough cross-examination of Dr. Smith.") (internal quotation marks and citation omitted).

The Court will follow the reasoning of *Passafiume* and allow Dr. Smith's testimony regarding the loss of housekeeping and household management services while excluding his testimony concerning the loss of advice, counsel, guidance, institution, and training services. While Defendants believe the testimony concerning housekeeping and household management services is unreliable, speculative and misleading, it is based on objective information and statistics and undoubtedly will be subjected to vigorous cross-

examination. Therefore, the Court will allow that testimony discussed in Section I(A) of Dr. Smith's report. In contrast, the loss of advice, counsel, guidance, institution, and training services are matters that are inherently personal. Any expert testimony attempting to quantify damages relating to those losses would be highly speculative, particularly when neither Long nor Marlene were interviewed. Therefore, Dr. Smith's testimony addressed in Section I(B) of his report is excluded.

### C. Hedonic Damages

In Section III of his report, Dr. Smith opines on the reduction in value of life or loss of enjoyment of life for Marlene. As the parties do, the Court will refer to these alleged losses as hedonic damages. Plaintiffs claim that the hedonic value of life refers to the value of the pleasure, the satisfaction, or the utility that human beings derive from life, separate and apart from the labor or earnings of life. In referring "to life's pleasures, we do not mean to imply that we are measuring the value of pleasure in the narrow sense, the process of life is something very pleasurable, but also sometimes intensely difficult." MICHAEL L. BROOKSHIRE & STAN V. SMITH, ECONOMIC/HEDONIC DAMAGES: THE PRACTICE BOOK FOR PLAINTIFF AND DEFENSE ATTORNEYS (1990). "It's a value of a statistical life." (Doc. 206-2 at 70). The willingness to pay model is one means of valuing human life. Under this approach, "the hedonic value of life is estimated from the price associated with a small change in the risk of death, as determined in several different ways through questionnaire studies, consumption studies, and labor market studies. Stanley A. Smith, *The Hedonic Value of Life. Economic Expert Witness in Testimony in Injury and Wrongful Death Cases*, EXPERT EVIDENCE REPORTER, Sep. 1989, at 3. Plaintiffs contend the concept in

economic science that life has a value beyond a labor value is not new. Moreover, this broad body of science in recent decades has become widely accepted in academia as the conventional methodology in measuring the value of life.

In his report, Dr. Smith states that his "estimate of the value of life is consistent with estimates published in other studies that examine and review the broad range of economic literature on the value of life." (Doc. 206-1 at 8). One such study is *The Plausible Range for the Value of Life – Red Herrings Among the Mackerel*, 3.3 J. FORENSIC ECON. 17 (1990) by T.R. Miller. (*Id.*). The Miller study "show[s] the value of life to range from approximately $1.6 million to $2.9 million dollars in year 1988 after-tax dollars, with a mean of approximately $2.2 million dollars." (*Id.*). Another example is the Viscusi study, which "estimates the value of life to be approximately $4.7 million dollars in year 2000 dollars." (*Id.*). Another study "suggest[ed] a value of life of approximately $5.4 million in 2008 dollars." (*Id.*).

Dr. Smith's report states that the underlying literature falls into two general groups: (1) consumer behavior and purchases of safety devices; and (2) wage risk premiums to workers. (*Id.* at 9). Dr. Smith provides an example of how this works:

> As a hypothetical example of the value of a statistical life (VSL) methodology, assume that a safety device such as a carbon monoxide detector costs $46 and results in lowering a person's risk of premature death by one chance in 100,000. The cost per life saved is obtained by dividing $46 by the one in 100,000 probability, yielding $4,600,000.

*Id.*

Based on the other economic studies, Dr. Smith estimated the value of life "to be approximately $5.9 million in year 2023 dollars." (*Id.* at 10). Defendants claim Dr. Smith

relied upon abstract studies regarding the cost of various items that individuals purchase to protect their health. Defendants contend those studies were not designed to place an economic value on an individual's life in this manner.

Defendants note Dr. Smith only interviewed Marlene's daughter. He did not interview Marlene or Long. Dr. Smith's calculations were based on three assumptions: (1) an assumed impairment rating benchmark of 50% to 80% reduction in the ability to lead a normal life; (2) the $5.9 million estimate of the value of a statistical life in 2023; and (3) a life expectancy for Marlene of 85.7 years. Dr. Smith provided a "lower estimated impairment rating" and an "upper estimated impairment rating," based on his range for either 50% or 80% reduction in value of life. Pursuant to his methodology, Dr. Smith estimated a total loss of value of life of $1,954,626 for 50% reduction and a total of $3,127,391 for 80% reduction. To determine future loss, Dr. Smith accounted for a discount factor to create a present value. He then arrives at the value of hedonic damages by reducing the $5.9 million by the percentage of disability he believes Marlene has suffered—either 50% or 80%. Defendants note Dr. Smith did not consult with a single medical professional to arrive at his impairment rating.

Plaintiffs contend Dr. Smith first testified about the economic model to measure the value of life in *Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987). "It is therefore axiomatic that plaintiffs seeking to recover the value of a decedent's life must be entitled to submit expert testimony to help guide the jury in reaching an appropriate damages award." *Id.* at 205. In considering Dr. Smith's testimony of "how a life is valued in the field of economics," the court observed "Smith was well qualified to discuss this matter, and

indeed defendants did not question his qualifications at trial." *Id.* The court in *Sherrod* noted the district judge had determined, "[t]he fact that the hedonic value of a human life is difficult to measure did not make Smith's testimony or the damages speculative. The testimony of expert economist Stanley Smith was invaluable to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of Ronald's life." *Id.* at 206 (internal quotation marks and citation omitted).

Defendants allege federal and state courts have routinely barred Dr. Smith's testimony as to hedonic damages. In *Mercado v. Ahmed*, 756 F. Supp. 1097 (N.D. Ill. 1991), the Northern District of Illinois observed that "there is no basic agreement among economists as to what elements ought to go into the life valuation." *Id.* at 1103. The court determined that such testimony would be offered by "persons who are no more expert than are the jurors on the value of the lost pleasure of life. Even if reliable and valid, the evidence may fail to assist the trier of fact to understand the evidence or determine a fact in issue in a way more meaningful than would occur if the jury asked a group of wise courtroom bystanders for their opinions." *Id.* (footnote omitted). The court excluded Dr. Smith's testimony on hedonic damages. *Id.*

The Seventh Circuit affirmed the district court in *Mercado v. Ahmed*, 974 F.2d 863 (7th Cir. 1992). The court observed that the crux of the issue is whether Dr. Smith, "supported by his extensive willingness-to-pay research, know[s] better than the average juror how much life is worth." *Id.* at 870. The court considered the district court's reasons for rejecting Dr. Smith's testimony: (1) the lack of consensus among experts as to Dr.

Smith's method; and (2) "Smith's research was no more than a compilation of the opinions, expressed through spending decisions, of a large number of Americans as to the value of life." *Id.* at 870–71. The court found both criticisms to be valid and observed:

> [E]ven accepting Smith's premise that his method of determining the value of life is different in an important way from submitting the question to a jury because it focuses on observable behavior and not opinion, we have serious doubts about his assertion that the studies he relies upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth.

*Id.* at 871. The appellate court further noted the district court determined that "Smith was no more expert in valuing life than the average person. This conclusion may be less a reflection of the flaws in Smith's methodology than on the impossibility of any person achieving unique knowledge of the value of life." *Id.* The court stated "with confidence that the district court's decision to bar Smith's testimony" was not an abuse of discretion. *Id.*

Defendants cite other district court cases which have excluded Dr. Smith's testimony on hedonic damages. *See Ayers v. Robinson*, 887 F. Supp. 1049, 1064 (N.D. Ill. 1995) ("In sum, viewed in term of 'scientific knowledge' the hedonic damages proof tendered by [plaintiff] has thus failed to survive *Daubert* analysis."); *Bramlette v. Hyundai Motor Co.*, 1992 WL 213956, at *5 (N.D. Ill. 1992) ("This Court agrees with the reasoning in *Fetzer* [*v. Wood*, 211 Ill.App.3d 70 (2d Dist. 1991)], which would refuse expert testimony as invading the province of the jury."); *Doe v. Tag, Inc.*, 1993 WL 484212, at *3 (N.D. Ill. 1993) (barring Dr. Smith's testimony as "irrelevant" because it "would not assist the trier

of fact in reaching its decision"); *Crespo v. City of Chicago*, 1997 WL 537343, at *3 (N.D. Ill. 1997) (noting "the same flaws that were fatal in the pre-*Daubert* would remain fatal today" and determining that "the jury is able to decide for itself, without the assistance of an economic expert, the value that our society places on human life"); *Santillan v. Schaafsma*, 2006 WL 8443840, at *4–5 (C.D. Ill. 2006) (finding that Smith's testimony regarding hedonic damages does not meet *Daubert* requirements); *Richman v. Burgeson*, 2008 WL 2567132, at *4 (N.D. Ill. 2008) (excluding Dr. Smith's testimony regarding hedonic damages and stating "[t]he majority of cases uncovered by the court hold that the testimony is inadmissible under either Rule 702 or *Daubert*"); *Stokes v. John Deere Seeding Group*, 2014 WL 675820, at *6 (C.D. Ill. 2014) (excluding testimony after finding it doubtful that Dr. Smith's methodology was "generally accepted" and determining that his method was unreliable); *Michoń v. Campbell*, 2019 WL 8301067, at *2 (N.D. Ill. 2019) ("As many, if not most, courts in this District and elsewhere have reasoned, Dr. Smith's methodology for ascertaining hedonic damages is not scientifically reliable."); *Estate of Warner v. Wellpath*, 2021 WL 12310134, at *4 (S.D. Ind. 2021) (finding Dr. Smith's calculations to be unreliable and determining plaintiff had not shown that the testimony would assist the jury even if reliable); *Patch v. Glover*, 248 Ill. App.3d 562, 568 (1st Dist. 1993) (finding that Smith's hedonic damages and loss of society opinions "would mislead the jury into believing the false notion that the distinct and personal relationship that one has with his wife and children has commercial value which can be determined by a comparison to the value that society places on the non-monetary contributions of the statistically average person").

Plaintiffs rely primarily on *Sherrod* which is a pre-*Daubert* case. After considering Dr. Smith's report and testimony on hedonic damages, the Court agrees with the reasoning of the overwhelming majority of federal district courts within this circuit and the Illinois Appellate Court in *Patch* and finds the testimony is not reliable and, even if reliable, the testimony would not assist the jury. Therefore, the Court grants Defendants' motion to the extent it seeks exclusion of Dr. Smith's testimony on hedonic damages.

### D. Loss of Society or Relationship for Long Do

In Section IV of his report. Dr. Smith presents his opinions on loss of society or relationship relating to Long Do. Plaintiffs note Illinois law recognizes loss of society or relationship as a recoverable pecuniary loss. This is the total value of loss of society or relationship Long did and will suffer due to Marlene's alleged injuries. Dr. Smith testified that the loss is "the loss of love and affection that he has sustained, the loss of the quality of the relationship that he had that has impacted his quality of life." (Doc. 206-2 at 104). Defendants allege Dr. Smith did not speak to Long to obtain information from him about his own loss of society. Dr. Smith relies solely on Marlene's daughter's statement that Long had "lost 50 percent of the quality of his life due to the changes in his wife." (*Id.* at 102).

Defendants note Dr. Smith calculates loss of society in the same manner as his calculation for reduction in value/hedonic damages for Marlene. This loss is calculated from 2019 through 2030, which ends at Long's estimated life span of 81 years old. Dr. Smith picked $5.9 million as the value of each human life in 2023 dollars. He then arrives at the value of hedonic damages by reducing the $5.9 million by the percentage of

disability he believes Marlene has suffered. For loss of society, Dr. Smith chose 50% disability. He determined Long's loss of society was $403,273. For future loss, Dr. Smith accounts for a discount factor to create a present value.

Defendants contend the testimony should be excluded because the method of calculation renders the opinions inadmissible, as the methodology is unreliable and the testimony will not assist the jury. In support of the motion, Defendants cite *Santillian*, 2006 WL 8443840, wherein the district court barred Dr. Smith's opinions on the loss of society or relationship which were based on his hedonic damages calculations. *Id.* at 5. In *Ayers*, the court also excluded testimony on loss of excluded that testimony upon finding it was inadmissible under *Daubert*. *Ayers*, 887 F. Supp. at 1061–64; *see also Stokes*, 2014 WL 675820, at *3–6 (excluding any testimony premised on hedonic damages upon finding Dr. Smith's methodology unreliable). In *Patch*, the Illinois Appellate Court concluded the trial court did not abuse its discretion in barring Dr. Smith's testimony on the value of loss of society. 248 Ill. App.3d at 569. The court in *Patch* observed "Smith's proffered testimony on the value of the loss of society was marginally relevant, potentially confusing, and misleading." *Id.* at 568. Moreover, "Smith's valuations speak to the non-economic social value of the statistically average person, not Patch. The only attributes of Patch that entered into Smith's calculations were his age, sex, and race." *Id.*

Plaintiffs criticize Defendants' reliance on the above cases but cite no cases of their own except for *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which first articulated the "general acceptance test." Long and Marlene Do will testify at trial and they are in the best position to address the effect that Marlene's injuries had on "the loss of love and

affection" and "the loss of the quality of the relationship." As Defendants allege, the jury is capable of processing that information to calculate damages guided by their observations, experience, and sense of fairness. The Court agrees with those courts that determined Dr. Smith's opinions on this topic are speculative and potentially misleading in focusing on the statistically average person instead of the individuals in this case. Therefore, the Court grants Defendants' motion to the extent it seeks to exclude Dr. Smith's opinions on loss of society.

## III. CONCLUSION

For all of these reasons, Defendants' Motion to Exclude Opinions of Plaintiffs' Economic Expert Stan Smith, Ph.D., (Doc. 206), is GRANTED in part and DENIED in part. It is DENIED as to his testimony concerning loss of housekeeping and household management services. It is GRANTED in all other respects.

ENTER: September 23, 2025

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE